UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JHAN E. ELLIOTT,<br>   Plaintiff,<br><br> vs.<br><br>MICHAEL J. ASTRUE<br>Commissioner of Social Security,<br>   Defendant. | )<br>)<br>)<br>)   CAUSE NO. 1:05-cv-1392-LJM-WTL<br>)<br>)<br>)<br>) |

**ENTRY ON JUDICIAL REVIEW**

  Plaintiff, Jhan E. Elliott ("Elliott"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the final decision of Defendant, Michael J. Astrue, Commissioner of Social Security (the "Commissioner"), finding that he was not disabled under the Social Security Act (the "Act"). The Court rules as follows.

**I. BACKGROUND**

**A.  PROCEDURAL HISTORY**

  Elliott applied for Disability Insurance Benefits ("DIB") under Title II of the Act on July 30, 2002. R. at 33. He alleged that his disability began in April 2000, due to degenerative disc disease and herniated disks. R. at 33, 109. Elliott appeared and testified at a hearing before the Administrative Law Judge, Albert J. Velasquez (the "ALJ"), with counsel, on March 1, 2003. R. at 302-18. The ALJ issued his opinion on May 25, 2004, in which he found that Elliott had the RFC to perform a "significant range of sedentary work" and was not under a disability as defined in the Act. R. at 30-40. On August 5, 2005, the Appeals Council denied Elliott's Request for Review and the ALJ's decision became the final decision of the Commissioner. R. at 10-13. On September 16,

2005, Elliott filed a civil action seeking review of the ALJ's decision, pursuant to 42 U.S.C. § 405(g).

## B.  FACTS & MEDICAL HISTORY

Elliott was born on October 23, 1961. R. at 105. He was forty-two years old at the time of the decision by the ALJ. R. at 33. Elliott is a high school graduate and has work experience as a laborer and an automobile retail manager. R. at 110, 305.

Elliott has a long medical history documenting his back pain, the pertinent documentation of which began in 2000. An MRI performed on April 15, 2000, concluded as follows:

1. There is thoracolumbar Scheuermann's end-plate disease with juvenile discogenic disease of multiple lumbar intervertebral discs.

2. At L5-S1, there is a mild broad posterior disc bulge. There is a free fragment extruded herniation on the left side which is inferiorly displaced measuring 8 mm transverse, 3.5 mm anterior-posterior and approximately 10 mm in cranial caudal dimension. It is contacting without displacing or compressing the left S1 nerve root. There is moderate up-down stenosis of the left foramen with left L5 ganglion impingement secondary to disc protrusion and marginal spondylosis as well as related to the vertical narrowing of the disc.

3. At L4-5, there is moderate disc desiccation and mild vertical narrowing with internal derangement of the disc, 3 mm degenerative retrolisthesis and a mild posterior central disc bulge associated with annular tearing. There is mild facet arthrosis on both sides. There is no neural impingement at this level.

4. There is desiccation of L3-4 and L2-3 discs without significant disc contour abnormalities at these levels. At L1-2 and at T12-L1 there is mild to moderate disc desiccation, internal derangement of the disc with minimal posterior central disc bulges, no significant canal narrowing or neural impingement at these levels.

R. at 199-200.

A subsequent MRI performed on June 9, 2000, concluded as follows:

1. Thoracolumbar Scheuermann's end-plate disease with associated juvenile discogenic disease of L4-5 and L5-S1 discs.

2. At L5-S1, there is disc desiccation and a moderate broad posterior annular bulge. Bulging disc and spur result in mild to moderate stenosis of the left foramen and there is impingement of the left L5 ganglion.

3. At L4-5, there is a small herniation posteriorly into the midline and to the right of midline without neural impingement.

4. There is facet degenerative arthrosis bilaterally at L4-5 and at L5-S1.

R. at 197-98.

On September 19, 2000, Dr. David Ratzman ("Dr. Ratzman") performed a provocative diskography[1] on Elliott for diagnostic purposes. R. at 230-31. On October 24, 2000, Dr. Ratzman performed an intradiscal electrothermal moduation treatment ("IDET") on Elliott. R. at 235-36. In 2001, Elliott reported that he did not experience significant improvement in his axial back pain following the IDET procedure. R. at 215.

A subsequent MRI performed on January 2, 2001, indicated the following:

1. Diffuse disc bulges present at the L5-S1 level. A minimal disc bulge is suggested at the L4-5 level on the axial images. A small tear of the annulus fibrosus is noted posteriorly at the L4-5 level. No disc protrusion or extrusion is identified. There is no evidence of spinal stenosis. There is some minimal narrowing of the neural foramina . . . at the L5-S1 level inferiorly.

2. Disc desiccation at the L5-S1 level and L4-5 level with end plate signal changes noted at the L5-S1 level. Some minimal osteophyte formation is also noted within the lower lumbar spine.

R. at 193-94.

---

[1] Diskography is defined: "Radiographic demonstration of intervertebral disk by injection of contrast media into the nucleus pulposus." STEDMAN'S MED. DICTIONARY 507 (26th ed.1995) (hereinafter "STEDMAN'S").

On October 26, 2001, Elliott underwent diagnostic diskography, resulting in pre-operative and post-operative diagnoses of lumbar back pain and internal disc disruption. R. at 221. On January 10, 2002, Dr. Steven E. Levine ("Dr. Levine") performed two transpedicular endoscopic discectomies[2], diagnostic diskography, and foraminotomy[3]. R. at 158, 167-69. Dr. Levine's pre-operative and post-operative diagnoses indicated herniated nucleus pulposi, foraminal stenosis[4], and internal disc disruption. R. at 167.

On February 11, 2002, Elliott was examined by an internist, Qing Jia, M.D. ("Dr. Jia"), for a consultative evaluation. R. at 172-77. Following the evaluation, Dr. Jia provided the following assessment:

> Based upon my examination and the collateral medical information that was provided by the state agency it is my opinion that the claimant can over a single period of time sit for eight hours, stand for two hours and walk for one hour. In the total eight-hour workday the claimant can sit for eight hours, stand for two hours and walk for one hour. During an eight-hour workday the claimant can stand and walk for a combined total two hours. The claimant should be able to lift or carry 5 to 10 lbs occasionally. The claimant is able to grasp with both hands, can use push/pull arm controls with both hands, and maintains the ability to manipulate objects with both hands. Claimant can also perform repetitive movements as in pushing and pulling leg controls with right foot only. The claimant should never bend, squat, crawl, climb, or reach. Claimant should never work in unprotected heights, work around moving machinery but claimant can work around marked changes in humidity and temperatures operate automotive equipment and work around exposure to dust, fumes and gas frequently.

R. at 176.

---

[2] Discectomy is defined: "Excision, in part or whole, of an intervertebral disk." STEDMAN'S at 491.

[3] Foraminotomy is defined: "An operation upon an [inlet or entrance to a cavity or channel], usually to open it." STEDMAN'S at 676.

[4] Foraminal stenosis is defined: "A stricture of any canal." STEDMAN'S at 1673.

On March 13, 2002, Dr. Levine's examination noted that Elliott was "doing quite well" and that while Elliott had initially reported an increase in leg pain, "his leg pain and buttock pain is completely eradicated." R. at 158. Elliott's back pain, which he described as "deep, aching back pain" persisted and was treated with methadone. *Id.* Dr. Levine's physical examination also detected "significant paraspinous muscular spasm," but diagnosed Elliott as completely neurologically intact. *Id.*

On May 8, 2002, Dr. Levine's examination of Elliott identified "increasing lumbar back pain" and a continued complete extinguishment of his leg pain. R. at 156. Elliott's physical examination was consistent and he remained neurologically intact. *Id.*

On July 10, 2002, Dr. Levine's examination identified an increase in Elliott's lumbar back pain, greater pain in his left leg than his right leg, numbness in his left hand, and no weakness in upper extremities. R. at 155. Dr. Levine characterized Elliott's back pain as "unrelenting and intractable" and increased Elliott's methadone dosage. *Id.* The physical examination again demonstrated that Elliott was stable neurologically, but that straight leg raises caused more back pain than leg pain. *Id.*

On September 4, 2002, Dr. Levine's examination identified that although Elliott continued to suffer from chronic back pain, his radicular symptoms were almost completely eradicated. R. at 142. Again, on October 3, 2002, Dr. Levine noted that Elliott's physical examination was essentially unchanged and that he remained neurologically stable. R. at 141. Dr. Levine identified Elliott as suffering from intractable back pain and radicular symptoms, but noted that his leg pain remained almost completely eradicated. *Id.* Additionally, Dr. Levine described Elliott as "doing fairly well

though he is still suffering from back pain" and noted that medication and adjuvant therapy did a "fairly good job" of controlling Elliott's pain. *Id.*

On October 14, 2002, Techsin Ty, M.D. ("Dr. Ty"), performed a disability examination of Elliott. R. at 151-53. Elliott informed Dr. Ty that he was laid off in April, 2002, due to his back problems and could find no work that could accommodate him due to his back pain. R. at 151. He reported that he could not stand more than thirty minutes due to "lower back pains with cramps and aching and radiation and sharpshooting pain down both lower extremities." *Id.* Elliott indicated he does not do much at home and can lift no more than ten to fifteen pounds due to his back pain. *Id.* His physical examination showed no difficulty getting on or off the examination table, steady gait, and the ability to walk without any assistive device. R. at 152. Elliott was able to walk on heel, toe and tandem walk, but was unable to hop or squat. *Id.* Dr. Ty noted that Elliott's grip strength and finger manipulative ability were unremarkable. *Id.* Dr. Ty's Plan of Care for Elliott was as follows:

> The patient has significant pain and limitation in range of motion. He is requiring large amount of pain medication for pain control. I instructed the patient to continue with physical therapy. Certainly retraining for sitting-down job would be beneficial. It is doubtful that this gentleman can work at his previous job due to significant amount of limitation in his back.

*Id.*

On December 4, 2002, Dr. Levine examined Elliott and again reported that his leg pain remained completely gone, while his back pain remained totally intractable. R. at 140. This examination again indicated that physically, Elliott's condition remained unchanged, and that he was neurologically stable. *Id.*

On January 15, 2003, Dr. Levine examined Elliott and reported that Elliott complained of pain radiating across his shoulder blades down to the lumbar region. R. at 49. Elliott reported that

6

his pain was increasing and he was experiencing severe stiffness. *Id.* A physical examination revealed that Elliott was neurologically stable, his gait was intact, and that he favored his left leg in heel and toe walking. *Id.*

Physical examinations conducted by Dr. Levine on February 12, 2003, and April 9, 2003, diagnosed Elliott's condition as essentially unchanged. R. at 47-48. About a month later, on May 7, 2003, Elliott reported an increase in pain in both upper extremities and numbness, and on June 18, 2003, he reported an increase in pain in his lower extremities. R. at 45-46.

On June, 23, 2003, an MRI performed on Elliott revealed lumbar spondylosis.[5] R. at 53. On July 2, 2003, Dr. Levine's examination noted no neurological changes, but identified Elliott as having intractable lumbar back pain and greater pain in his left leg than in his right leg. R. at 44. Dr. Levine's examination suggested that Elliott may suffer from recurrent disc herniation which could impact the S1 nerve root. *Id.*

On August, 14, 2003, A. A. Smith, M.D. ("Dr. Smith"), a neurologist, examined Elliott and conducted EMG testing, indicating bilateral irritative changes at multiple cervical spinal nerve roots and bilateral irritative and denervation changes at multiple lumbosacral spinal nerve roots. R. at 272-74, 60-61. On February 20, 2004, Elliott's counsel posed questions to Dr. Smith regarding Elliott's condition. R. at 54-58. Dr. Smith identified that he first evaluated Elliott on August 14, 2003. R. at 55. Dr. Smith's clinical neurological examination showed "moderate diffused paraspinous muscle spasm markedly antalgic gait and dysesthesia radiating to all four extremities more pronounced in

---

[5] Spondylosis is defined: "Ankylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature." STEDMAN'S at 1656. Ankylosis is further defined, in part, as "stiffening or fixation of a joint as the result of a disease process." *Id.* at 93.

the legs than in the arms." *Id.* Dr. Smith interpreted the MRI performed on June 23, 2003, to indicate a "broad based disc protrusion at the L5-S1 level which projected to the left side to the area where the spinal nerve root exits between the vertebra in the low back" and found this to be consistent with the symptoms Elliott reported. *Id.* Dr. Smith interpreted the EMG test results as consistent with "acute irritation and denervation or permanent damage to multiple lumbosacral spinal nerve roots as well as a lesser degree of irritation involving cervical spinal nerve roots." *Id.* Dr. Smith noted the likelihood that Elliott will require additional lower back surgery and confirmed that his test findings were consistent with Dr. Levine's diagnosis of intractable back pain. R. at 56. Dr. Smith also noted that Elliott's pain was aggravated when he sat in one position for a period of time of less than one hour and that "he would have marked limitation of tolerance for standing, walking, or lifting and given these types of limitations, he would be unable to perform even any type of sedentary work activity." R. at 57. Additionally, Dr. Smith found Dr. Jia's previous diagnosis, indicating that Elliott could sit for eight hours, to be completely inconsistent with his observations and test results. *Id.* Dr. Smith further opined that Elliott could be in no position that would afford him comfort, but that the least degree of discomfort would result from being in a reclined position. R. at 57-58.

On March 10, 2004, Dr. Levine conducted a Physical Capacities Evaluation (the "Evaluation") of Elliott indicating that during an eight-hour workday or during any one period of time, he could not sit or stand at all and could only walk for one-half hour. R. at 276-77. The Evaluation noted that Elliott could only stand and/or walk, in combination, at one time, for fifteen to thirty minutes. R. at 276. Further, in an eight hour workday, he could only stand and/or walk, in combination, for thirty minutes. *Id.* The Evaluation stated Elliott could occasionally lift and carry

up to ten pounds. *Id.* The Evaluation noted that Elliott could use both hands for simple grasping, but could not use them for pushing and pulling of arm controls or for fine manipulation. *Id.* Additionally, Elliott could not use his feet for pushing and pulling leg controls. *Id.* The Evaluation stated that Elliott could not bend, squat, or climb, but that he could occasionally crawl and reach. R. at 277. Dr. Levine's Evaluation further included the following limitations for specific activities: moderate limitation for unprotected heights, mild limitation for being around moving machinery, mild limitation for exposure to marked changes in temperature and humidity, mild limitation for driving automotive equipment, and no limitation for exposure to dust, fumes, and gases. *Id.*

### C.  HEARING TESTIMONY

At the Social Security Administration hearing held on March 1, 2003, Elliott testified before the ALJ that he is married with four children, ages ten, nine, six, and five. R. at 306. He testified that his father was paying almost all of the family's bills and he had not worked since April 2000. R. at 306. Elliott testified that his wife is employed and he is responsible for supervising the children in the morning, including getting the boys off to school and watching his daughter until she goes to preschool. R. at 309. He testified that he drives his daughter to preschool and picks her up after school if he is feeling well enough to do so. R. at 310. He further testified that during the day he often lies down for about six or seven hours and has pain that persists throughout the day. R. at 311-12. Elliott testified that the pain he experiences does not get better or worse when he moves around, but that it improves with rest. R. at 313. He indicated that he had to stop working as a forklift driver because he sat nearly all day and it was too painful for him to do so. R. at 314.

A vocational expert, Stephanie Archer ("Archer"), was also present at the hearing and provided testimony regarding occupations suitable for individuals with residual functional capacity ("RFC") similar to that of Elliott. R. at 315-17. The ALJ asked Archer to identify any types of work that fit the following RFC:

> Must be allowed to alternate into a sitting or standing position at his option for a period of one or two minutes per hour and further the work should require no more than occasional bending, squatting or climbing of stairs and ramps with no kneeling; no crawling; no climbing of ropes, ladders or scaffolds. The individual should avoid walking on uneven surfaces and avoid work at unprotected heights, around dangerous moving machinery or operating a motor vehicle or being around any . . . large bodies of water.

R. at 315. Archer noted that, although this RFC would not permit Elliott to perform his former occupations of assembler, material handler or manager, other jobs remain available. R. at 315-16. Examples of such jobs include, assemblers at the light level (approximately 1,500), general office clerks at the light level (approximately 2,900), and packers at the light level (approximately 1,100). R. at 316. Additionally, Archer testified that sedentary work possibilities include, assemblers (4,100), general office clerks (1,300), and packers (800). R. at 317.

Elliott's counsel inquired as to the types of jobs available for an employee with a "hypothetical limitation" of two hours standing, one hour walking, and occasional lifting of five to ten pounds. R. at 316. Archer testified that this limitation level would preclude even sedentary work. *Id.*

## II. DISABILITY AND STANDARD OF REVIEW

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423 (d)(1)(A). In determining whether a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1. If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2. If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, then it shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner. *See, e.g.*, *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.* While a scintilla of evidence is insufficient to support the ALJ's

findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### III. THE ALJ'S FINDINGS

At the first step of the disability analysis, the ALJ found that Elliott had not engaged in substantial gainful activity since his alleged onset of disability. R. at 39. At the second step, the ALJ found that Elliott had a "severe" impairment consisting of degenerative disc disease, but found, at the third step, that his severe impairment was not attended by medical signs or laboratory findings that meet or medically equal any impairment included in the Listing of Impairments. R. at 34, 39. The ALJ further found that Elliott's allegations regarding his limitations were not totally credible. R. at 39. The ALJ then found that Elliott had the RFC to perform sedentary exertional work, defined as follows:

> ability to alternate into a sitting or standing position at option for periods of one to two minutes per hour; no kneeling, crawling, squatting or climbing of ropes, ladders or scaffolds; no walking on uneven surfaces or work at unprotected heights, around dangerous machinery, or operating a motor vehicle, or being around open flames or large bodies of water.

*Id*.

Based on the determined RFC, at the fourth step the ALJ concluded that Elliott was unable to perform his past relevant work. *Id.* The ALJ proceeded to the fifth step and found that there were a significant number of jobs that Elliott could perform, taking into account his inability to perform the full range of sedentary work. *Id.* Such positions in the national economy include, assembler

(4,100 jobs), general office clerk (1,300 jobs), and packer (800 jobs).  *Id.*  The ALJ ultimately determined that Elliott was not under a "disability," as such term is defined in the Act.  *Id.*

## IV. DISCUSSION

Elliott asserts that the ALJ's decision, which became the decision of the Commissioner, is not supported by substantial evidence.[6]  Specifically, Elliott asserts that the ALJ improperly rejected the opinions of Dr. Levine and Dr. Smith, arguing that treating source opinions should be controlling.  In support of this position, Elliott relies on SSR 96-8p which states, in pertinent part:

> The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.
>
> Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and *may* be entitled to controlling weight.  If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the adjudicator must give it controlling weight.

SSR 96-8p (emphasis added).  Elliott argues that Dr. Levine's and Dr. Smith's opinions are not inconsistent with the record and should be given controlling weight.

---

[6] Although additional evidence in the form of a second deposition from Dr. Smith, taken May 5, 2005, was submitted to the Appeals Council, such evidence was not before the ALJ for consideration.  *See* R. at 278-80.  Elliott has not asked the Court to consider this evidence and, if he had, the Court could only consider it to determine whether the additional evidence warrants remand under the sixth sentence of 42 U.S.C. § 405(g).  Elliott's failure to raise this issue to the Court and failure to request sixth sentence remand have waived the issue on appeal.  *See Sere v. Bd. of Trs. of Univ. of Ill.*, 852 F.2d 285, 287 (7th Cir. 1988) (noting that the waiver doctrine has been "consistently and evenhandedly" applied "when appellants have failed to raise an issue in their opening brief").

The Seventh Circuit Court of Appeals noted that it is proper for the ALJ to place more weight on the medical opinion of a claimant's treating physician due to the "greater familiarity" that a treating physician has with the claimant's medical condition. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). The Clifford court clarified that "[a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Id.* The Clifford court further cautioned that the ALJ may not substitute his own opinion or judgment for a physician's opinion "without relying on other medical evidence or authority in the record." *Id.* (citing *Rohan v. Chater*, 98 F.3d 966, 968 (7th Cir. 1996)).

In making disability determinations, "[i]f any of the evidence in [the] case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, [the ALJ] will weigh all of the evidence and see whether [he] can decide whether [the claimant is] disabled based on the evidence [he has]." 20 C.F.R. § 404.1527(c)(2).

The ALJ found that the objective evidence in the record did not support the degree of limitation to which Elliott alleged his pain and weakness required. R. at 35. As such, the ALJ considered other evidence to determine "if the claimant's allegations can reasonably be accepted as consistent with the medical and other evidence." *Id.* The ALJ conducted an extensive review of Elliott's medical history, examinations by various physicians, and treatment records. R. at 35-37. The ALJ found that Elliott could still perform some work, although his activities "are somewhat severely restricted" due to "his chronic back pain and limitation of motion in the lumbar spine." R. at 37.

In explaining his findings, the ALJ pointed to numerous medical examination reports following Elliott's surgery that were inconsistent with Elliott's claim of intractable pain. *Id.* Specifically, the ALJ noted that both Dr. Jia and Dr. Ty found that Elliott was capable of performing work at the sedentary level and found clinical support for that assessment. *Id.* By contrast, the Evaluation performed by Dr. Levine on March 10, 2004, assessed Elliott as (1) not able to sit or stand at all in an eight-hour day, (2) only able to walk for one-half hour during an eight-hour day, (3) not able to use his hands for pushing and pulling of arm controls and fine manipulation, (4) not able to bend, squat or climb, but he could occasionally crawl and reach, (5) subject to mild limitations in being around moving machinery, exposure to marked changes in temperature and humidity, and driving automotive equipment, and (6) subject to moderate restriction against working at unprotected heights. R. at 276-77. The ALJ stated:

> The physical capacities evaluation completed by the claimant's surgeon seems inconsistent in itself, not consistent with clinical findings from his pain institute and further inconsistent with the other evidence in the record. He stated the claimant cannot sit or stand at all which obviously is contradicted by the fact that the claimant sat through a hearing and if he could not stand at all, he would be on crutches or a walker. He ambulates independently. [The Evaluation] stated the claimant could not use upper extremities for pushing and pulling or fine manipulation, despite the fact the claimant was found to have no upper extremity limitations and found limitations with both lower extremities which is inconsistent with objective findings. [Dr. Levine] found only mild restrictions as to being around moving machinery and driving automotive equipment, and only a moderate limitation against working at unprotected heights, which also seems inconsistent with incapacitating back pain.

R. at 37.

The ALJ more fully expanded upon the inconsistencies identified between Dr. Levine's Evaluation and the medical records from Dr. Levine's treatment of Elliott at the pain management clinic. *Id.* Dr. Levine's monthly evaluations of Elliott almost consistently indicated his neurological

15

stability or noted that his physical exam remained unchanged from the prior visit. R. at 44-50, 140-42, 155-56, 158. The ALJ specifically identified examination findings nine months following surgery that "reported a steady gait and no assistive device, which I find to be quite inconsistent with the severe, intractable pain the claimant alleges." R. at 37. Further, the examination notes indicated "[m]ore significant limitation in lumbar range of motion was found here, but normal otherwise throughout. Again, muscle strength, grip strength and fine finger manipulation were normal." *Id.* Such examination findings were inconsistent with Dr. Levine's evaluation which indicated Elliott could not use his upper extremities for fine manipulation or pushing or pulling. R. at 37, 276. Additionally, Dr. Levine's notes indicated that Elliott did identify some numbness in his left hand, but Elliott "denie[d] any weakness in his upper extremities." R. at 155. The severe restrictions and limitations, precluding even sedentary work, that are identified by Dr. Levine in the Evaluation appear to be in conflict with Dr. Levine's treatment notes indicating Elliott was experiencing "moderate pain control," and was "doing fairly well though he is still suffering from back pain." R. at 46, 141.

The ALJ properly complied with the requirements of SSR 96-8p in evaluating Dr. Levine's treating source opinion. The ALJ conducted a thorough review of Dr. Levine's treatment records, medical examinations, and evaluation of Elliott. Under SSR 96-8p, the ALJ was not required to give Dr. Levine's opinion controlling weight if the ALJ determined that the opinion was "inconsistent with the other substantial evidence in the case record." *See* SSR 96-2p (cautioning that "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record"). Therefore, due to the

16

numerous inconsistencies identified by the ALJ in the case record, there is substantial evidence to support the ALJ's decision not to place controlling weight on Dr. Levine's evaluation and, ultimately, to support the ALJ's decision in this matter.

Elliott further alleges that the ALJ failed to grant controlling weight to Dr. Smith's opinion and asserts that Dr. Smith is a treating source. Elliott argues that the ALJ omitted evidence of Dr. Smith's treatment notes in making his decision and noted that the ALJ found no apparent records of treatment by Dr. Smith.

In explaining his evaluation of Dr. Smith's findings and the lack of treatment records from Dr. Smith, the ALJ stated that, "despite the significant MRI and EMG findings he cites, there is no indication of specific clinical findings including physical maneuvers the claimant could or could not perform." R. at 37. Further, the ALJ found that Dr. Smith "very generally noted significant symptoms and concluded the claimant would be precluded from all work activity." *Id.* Even if this Court were to find that Dr. Smith was a treating source[7], although the Court does not find it necessary to make such a determination, Dr. Smith's opinion would still not be entitled to controlling weight. The ALJ's decision addressed the medical tests administered by Dr. Smith and related findings. *Id.* The absence of specific clinical findings and the deposition testimony involving Elliott's inability to perform even sedentary work, again, point to inconsistencies with substantial

---

[7] Pursuant to 20 C.F.R. § 404.1502, a "treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." Further, "ongoing treatment relationship" involves being seen by the source "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)." *Id.* A source will not be a treating source if "your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability." *Id.*

evidence in the record as a whole. As previously discussed, controlling weight is not required to be given to a treating source opinion "if it is inconsistent with the other substantial evidence in the case record." SSR 96-2p. As such, the ALJ's decision is supported by substantial evidence in the record, particularly, by the findings of both Dr. Ty and Dr. Jia.

The decisions by the ALJ not to rely on particular medical evidence, test findings, and evaluations, whether offered by treating sources or nontreating sources, is fully and reasonably explained in the ALJ's decision. *See Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (noting that the "ALJ must 'sufficiently articulate his assessment of the evidence to assure us that [he] considered the important evidence...[and to enable] us to trace the path of [his] reasoning.'") (quoting *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996)). The ALJ's reasoning and explanations in this case "'build an accurate and logical bridge between the evidence and the result.'" *Id.* (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). As such, this Court finds that the ALJ's decision, and the ALJ's treatment of Dr. Levine's and Dr. Smith's medical opinions and inconsistent record evidence, are supported by substantial evidence in the record.

Additionally, the ALJ provided a further rationale for his findings in this case. The ALJ noted that Elliott has been treated with medication. R. at 38. Elliott provided no documentation of any injections used to treat his back pain and has not used a TENS unit in treatment of his back pain. *Id.* Further, he used no assistive devices and did not utilize a back brace. *Id.* In an effort to evaluate Elliott's subjective complaints regarding his pain, the ALJ specifically "credit[ed] these to diminish his capacity for basic work activities only to the extent that they are reasonably consistent with the objective medical evidence and other evidence of record." *Id.* For example, the ALJ highlighted Elliott's ability to care for his children, including, getting them ready for school, taking care of a

preschool child, and driving the preschool child to school. *Id.* Additionally, the ALJ found that Elliott's subjective claims were not entirely credible because his performance on physical examinations was not consistent with his claimed limitations. *Id.* Addressing the inconsistency between Elliott's subjective limitations and the state examiners' findings that Elliott retained the ability to perform work at the light level with postural limitations, the ALJ specifically gave "claimant the benefit of the doubt" and designated an RFC at the sedentary level with additional limitations. *Id.*

## V. CONCLUSION

For the foregoing reasons, the final decision of the Commissioner of Social Security in this case is **AFFIRMED**. Final judgment shall be entered accordingly.

IT IS SO ORDERED this 26th day of September, 2007.

_____
LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronically distributed to:

Charles J. Myers
cmyers7943@sbcglobal.net

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov